**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:20-CR-418 JAR/NAB |
| JAMES TIMOTHY NORMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  This matter is before the Court upon Defendant James Timothy Norman's Motion to Suppress Evidence. (Doc. 183.) The United States of America filed a response. (Doc. 186.)

I.     **BACKGROUND**

On August 11, 2020, Mr. Norman was charged in a Criminal Complaint with conspiracy to use interstate commerce facilities in commission of murder for hire, resulting in death in violation of 18 U.S.C. § 1958. (Doc. 1.) On August 20, 2022, Mr. Norman was charged in a three-count indictment. In Count One, Mr. Norman and Terica Ellis are charged with conspiracy to use interstate commerce facilities in commission of murder for hire, resulting in death in violation of 18 U.S.C. § 1958; in Count Two, Mr. Norman and Ms. Ellis are charged with use of interstate commerce facilities in commission of murder for hire, resulting in death in violation of 18 U.S.C. § 1958; and in Count Three, Mr. Norman and Waiel Yaghnam are charged with wire and mail fraud in violation of 18 U.S.C. § 1349. (Doc. 13.) On November 12, 2020, Mr. Norman was

charged in a superseding indictment. The charges against him remained the same, but a third co-defendant was added to the case. Travell Hill is charged with Mr. Norman and Ms. Ellis in Counts One and Two of the superseding indictment. (Doc. 80.)

 The superseding indictment alleges that Mr. Norman conspired with co-defendants Ms. Ellis and Mr. Hill to murder Andre Montgomery.  It is alleged that Mr. Norman paid Ms. Ellis $10,000 and paid Mr. Hill $5,000 for their roles in Mr. Montgomery's murder. The indictment also alleges that Mr. Norman sought several life insurance policies on Andre Montgomery before the murder using false information, then following Mr. Montgomery's murder, he unsuccessfully attempted to collect on one policy.

On March 25, 2022, I held an evidentiary hearing on Mr. Norman's Motion to Suppress Evidence. (Doc. 197.)  Mr. Norman appeared in person, represented by Joseph Hogan and Ethan Corlija, and the United States was represented by Assistant United States Attorneys Angie Danis and  Gwendolyn Carroll.   During the hearing, I heard testimony from FBI Special Agent Christopher Faber, Defendant Norman, and Detective David Rudolph of the St. Louis Metropolitan Police Department (SLMPD).  Following the hearing, a transcript was prepared, and the matter is ripe for ruling.  For the reasons below, I recommend denial of Mr. Norman's motion.

## II.    FINDINGS OF FACT

### a.    Agent Christopher Faber

Faber is a Special Agent with the FBI St. Louis Violent Crimes Task Force.  He has worked in that capacity for three years and has seventeen years of law enforcement experience. In 2019, Agent Faber became involved in an investigation into the homicide of Andre Montgomery. Montgomery was killed on March 14, 2016.  On August 11, 2020, Agent Faber obtained an arrest warrant for James Timothy (Tim) Norman. (Exh. 2.)  After determining that Mr. Norman lived in Ridgeland Mississippi, Agent Faber traveled to Mississippi to arrest Mr. Norman.  On the morning

2

of August 18, 2020, Agent Faber and ten other law enforcement officers arrived at Mr. Norman's home to take him into custody.  Approximately seven officers approached the front door of the residence.  One of the agents knocked on the front door and Mr. Norman came to the door.  He walked out of the house with his hands up and he followed all of the officers' commands.  Mr. Norman was dressed in a tank top, gym shorts and flip-flops.  Agent Faber handcuffed Mr. Norman and conducted a search incident to arrest.  When he searched Mr. Norman, he found an iPhone in Mr. Norman's pants pocket. (Exh. 1.)  Mr. Norman was then placed in a police vehicle and transported to the Jackson, Mississippi field office.  Agent Faber stated that he never entered Mr. Norman's residence and that no members of the arrest team entered the house.  After the cell phone was seized, it was placed into an FBI evidence envelope. (Exh. 1b.) At the Jackson field office, Mr. Norman signed a property receipt for the iPhone and iPhone case. (Exh. 4.)

Mr. Norman was sent to the Madison County Mississippi jail following his arrest. Investigators monitored Mr. Norman's calls from the jail.  Agent Faber reviewed Mr. Norman's calls and found two calls that he deemed relevant to the issue of whether Mr. Norman had a cell phone with him when he was arrested.  Agent Faber worked with an investigative team to transcribe the relevant calls.  The calls and transcripts were admitted during the hearing. (Exhs. 7, 7a, 8, 8a, 9.)

On August 24, 2020, Mr. Norman made calls from the jail to two unidentified people.  In one call, Mr. Norman states the following:

> I'm sitting at the breakfast table eating McDonald's, man, they bang on the door.  I open it. It's 7, it's 7 motherfuckers with machine guns right in my face, bro. They take me in man.  In ain't got nothing but my gym shorts, my fucking phone, and my tank top on.  They take me in, blah, blah, blah….

(Exhs. 7, 7a.)

In another call from the jail on the same day, Mr. Norman is talking with an unidentified female. Here are excerpts from the conversation:

> I'm sitting at the fucking breakfast table, the guys are banging on the fucking door.  It's like 7:30, 8AM. They yell, Tim Norman…
>
> I go open the fucking door, it's like, it's like 7, 8 fucking, uh, Army motherfuckers with machine guns pointed at me.
>
> I mean I ain't have, I ain't have enough time to fucking turn my phone on and Live or record none of that shit….
>
> It's just hand, you know, hands up an they just took me.  I had on my …my gym shorts, and my fucking tank top and my phone and my flip flops….

(Exhs. 8, 8a.)

On September 2, 2020, Agent Faber obtained a warrant authorizing the search of Mr. Norman's cell phone. (Exh. 6.)  On September 3, 2020, Agent Faber took the cell phone to the SLMPD so that the phone could be forensically examined.  SLMPD Detective David Rudolph initialed the SLMPD envelope indicating receipt of the phone.

**b.    James Timothy Norman**

Mr. Norman testified that he was eating breakfast in the early morning hours of August 18, 2020 when he heard knocking on the door and someone yelling his name.  When he went to the door, he saw a number of law enforcement officers with guns drawn.  He exited the house with his hands up.  He was dressed in shorts, a tank top, and flip flops.  He stated that he had his wallet in the pocket of his shorts.  Mr. Norman testified that his cell phone was on a small table just inside the house near the front door.  Mr. Norman says he was patted down by one of the officers who removed the wallet from his shorts.  Mr. Norman stated that the officer who removed his wallet went through it and pulled out his identification stating, "he's not going to need this". That officer, according to Mr. Norman, then walked into the house, put the wallet on the table and

4

picked up the cell phone.  The officer held the phone in the air and said, "his phone".  Another officer took the phone and Mr. Norman was then handcuffed.  Mr. Norman never gave anyone permission to enter his home.

### c.    Detective David Rudolph

The defendant called Detective Dave Rudolph to testify.  Detective Rudolph has been with the SLMPD for seventeen years.  He began investigating the homicide of Andre Montgomery in September 2019.  He requested the assistance of the U.S. Attorney's Office when he determined there was a financial aspect to the investigation.   Rudolph traveled to Mississippi for Mr. Norman's arrest.   Detective Rudolph was present when Mr. Norman was arrested, but he did not take part in the arrest. After the arrest, Agent Faber said he seized the phone from Mr. Norman. The first time he touched Mr. Norman's phone was on September 3, 2020, when Agent Faber brought it to him packaged in an FBI envelope after the search warrant had been obtained. Detective Rudolph then packaged the phone in a SLMPD envelope and delivered it to the cyber crimes division.

## III.   LEGAL ANALYSIS

Mr. Norman seeks to suppress the evidence seized in connection with the execution of the arrest warrant.  He claims that law enforcement officers entered his home and seized his cell phone without a warrant or his consent in violation of his Fourth Amendment rights.

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003).  Searches conducted outside the judicial process, without prior approval by judge or magistrate, "are *per se* unreasonable under the Fourth Amendment—subject

only to a few specifically established and well-delineated exceptions." *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Id.* A search incident to arrest may lawfully extend to "the arrestee's person and the area within his immediate control," that is, "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (internal quotation marks omitted). This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant,* 556 U.S. at 338.

Here, whether there is a Fourth Amendment violation depends on the version of the facts the undersigned finds credible. The United States contends that there was no search of Mr. Norman's residence and that the cell phone was seized during a search incident to Mr. Norman's arrest. Mr. Norman, on the other hand, claims that an officer stepped into his residence and removed the cell phone from a table near the door.

Having observed all the witnesses and having heard the recordings of the phone calls Mr. Norman made from the Madison County jail, I find Agent Faber's testimony to be credible. Agent Faber testified that he conducted a pat down search after he handcuffed Mr. Norman. In the recorded calls, Mr. Norman describes wearing a tank top, shorts, flip flops and having his phone. Twice in the calls he mentions the telephone. He never mentioned that the officers removed a wallet from his shorts, and he never said officers entered his home. Given the level of detail he provided about his arrest in those calls, it is hard to believe he would have omitted that information.

I therefore find that the phone was seized from Mr. Norman during the search incident to arrest and therefore there is no Fourth Amendment violation.

6

## IV.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that Defendant James Timothy Norman's Motion to Suppress Evidence (Doc. 183) should be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact.  *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir. 1990).

_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of April, 2022.