# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 CR 00418-1 |
| | ) | |
| v. | ) | Judge John A. Ross |
| | ) | |
| JAMES TIMOTHY NORMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT NORMAN'S POSITION REGARDING SENTENCING IN LIGHT OF THE 3553 FACTORS

Defendant, JAMES TIMOTHY NORMAN, by and through his undersigned attorneys, respectfully makes the following submission regarding sentencing in light of the section 3553 factors and states as follows:

### Standard

In imposing Mr. Norman's sentence, this Court is required to consider the "3553 factors." *See, e.g., United States v. Ross*, 29 F.4th 1003, 1007 (8th Cir. 2022) (*citing* 18 U.S.C., § 3553).

Those factors, including among others:

**(1)** The nature and circumstances of the offense and the history and characteristics of the defendant;
**(2)** The need for the sentence imposed--
**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
**(B)** to afford adequate deterrence to criminal conduct;
**(C)** to protect the public from further crimes of the defendant; and
**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Accordingly, a District Court must impose a sentence that is "sufficient, **but not greater**

1

**than necessary**, to comply with the purposes" of Section 3553. *Id.* at 18 U.S.C., § 3553 (emphasis added).

### *The "History And Characteristics" Of Mr. Norman*

Mr. Norman's life has been touched by violence and tragedy. Mr. Norman was raised in a single parent household by his mother, Robbie Montgomery. Mr. Norman's father was murdered on Natural Bridge Road in Saint Louis when he was still in his mother's womb. Mr. Norman's older brother (Andre Montgomery's father) was also murdered in Los Angeles. Andre was under one year old at the time, and Mr. Norman 15 years old. Mr. Norman also endured the loss of several close friends and other family members from gang violence during his upbringing.

Mr. Norman and his mother experienced homelessness several times during Mr. Norman's childhood. Mr. Norman and his family did not even have the financial means to bring Mr. Norman's brother's body back from Los Angeles to Saint Louis for a proper family burial, nor could they afford a headstone at that time for Mr. Norman's father. That substantial level of poverty resulted in Mr. Norman having very little to support his basic needs, including things such as stable housing and food. Those factors also made Mr. Norman susceptible to the strong influences from local gangs and drug dealers.

Despite those odds and difficult upbringing, Mr. Norman was a model student while in school. He achieved high marks until he was incarcerated at age 17. Mr. Norman used his time while in custody to continue his high school education, rehabilitate his outlook on life, and most importantly find a way to support his family when released.

Mr. Norman found his calling while incarcerated. He discovered that he had talents in the arts, specifically, performing and creative arts. Mr. Norman took acting and writing classes that were offered while he was in State prison while serving his sentences from his juvenile convictions.

He excelled in those courses and eventually wrote a screenplay and pilot for a television show centered on his mother's soul-food restaurant, "*Sweetie Pie's*." Mr. Norman then, upon release, filmed the pilot himself, directed it, edited it, and created the story arcs for a full season. He then singlehandedly pitched the idea to several different studios, eventually convincing a prominent studio to invest in his show entitled, "*Welcome to Sweetie Pie's*."

Mr. Norman's show was a wild success. Orpah Winfrey premiered the show on her "OWN Network" and renewed it for nine consecutive seasons. Mr. Norman's show centered on racial issues in Saint Louis and abroad; gang violence in the black community; poverty; and the triumphs and struggles of an (his) African-American metropolitan family. The show garnered several awards for its willingness to educate people on the darker side of post-conviction life. Specifically, Mr. Norman filmed several story arcs that focused on the hiring of felons and persons with serious criminal backgrounds. Mr. Norman was the recipient of several awards from the community for investing and opening restaurants in poor economic neighborhoods, for bringing sustainable and gainful employment to those areas, and for giving felons a second chance at life.

Indeed, this Court heard first-hand—from the trial testimony of various witnesses—that Mr. Norman contributed mightily to the community and to his family.

For example, Carl Nappa testified at trial about Mr. Norman's efforts, and success, in gaining Andre Montgomery's admission to a prestigious music school in Saint Louis and covering his tuition. *See* Trial Tr., Sept. 12, 2022, at pp. 54-55.

Likewise, Ms. Melodie Calvert, who was intimately familiar with both Mr. Norman and Andre Montgomery, testified that Mr. Norman acted as a "father figure" and mentor to Andre Montgomery. *See* Trial Tr., Sept. 13, 2022, at pp. 11-14. She testified, in relevant part:

> Tim like a father figure and mentor was to Andre. He helped him on the show to
> have more scenes on the show. He helped him with his education. He always

encouraged Andre to do more, to do better, and just was just a role model and mentor to him. He loved him.

*Id.* at pp. 13:22-14:3.

Similarly, Bruce George testified at trial and attested to Mr. Norman's treatment and relationship with regards to Andre Montgomery. *See* Trial Tr., Sept. 11, 2022, at pp. 74-77.

Likewise, Calvin Payne testified at trial, *inter alia*, that Mr. Norman supported Andre Montgomery, and was "trying to help make sure that Andre was on the right path." *Id.* at p. 89.

In sum, the "history and characteristics" of Mr. Norman strongly favor a sentence that is no more than 20 years.

***The Need To Avoid Disparate Sentences***

The Supreme Court has made it clear that District Court judges must apply the 3553 factors in such a manner so as to avoid "sentencing disparities." *See United States v. Booker*, 543 U.S. 220 (2005); *United States v. Gall*, 128 S.Ct. 586 (2007); *see also United States v. Knauls*, 416 Fed.Appx. 583 (8th Cir. 2011); *United States v. Crane*, No. 22-1849, 2022 WL 13705211 (8th Cir. 2022). In this case, such sentencing disparities are glaringly present.

Here, the Government's "star witness," Hill admitted during his trial testimony that he was the individual who murdered Andre Montgomery. *See* Trial Transcript, Sept. 8, 2022, at pp. 128:5-13; 136:20-137:20. Indeed, he testified - without objection, rebuttals, or rehabilitation from the Government - that not only did he pull the trigger, but that it was his choice to do so; that nobody influenced him to make that decision; and that no one pressured him to do so. *Id.* at p. 137:13-22. Accordingly, with respect to the conduct that is the entire crux of the present case, i.e., the murder of Andre Montgomery, there is absolutely no basis for a finding that Mr. Norman was somehow more culpable for that conduct, in comparison to Hill. Indeed, the only reasonable conclusion is

4

that Mr. Norman is *less* culpable than Hill for that act. Accordingly, for Mr. Norman to serve a period of incarceration that is far greater than Hill is directly contrary to the spirit and purposes of section 3553.

There are additional reasons why a sentence of life will create sentencing disparities. Here, Hill, a convicted felon, could have also been charged with violations of federal narcotics law based upon his possession of "Meth." *See* Dkt. at No. 321. As this Court will recall, the Government claimed to have inadvertently forgotten to disclose that important fact after producing that information a few days before trial, on August 31, 2022. *Id.* at pp. 4-5.

In any event, Hill was not charged with that federal drug crime and thus entirely avoided a prosecution that would have exposed him to additional years in federal prison. Therefore, this is no basis for "rewarding" Hill's cooperation with the Government in this case by way of a lower sentence than Mr. Norman. Hill has already been greatly rewarded by the Government's non-pursuit of federal drug charges against him in exchange for his cooperation.

There are additional reasons why a sentence of life for Mr. Norman creates substantial sentencing disparities. In this case, according to the Government's position through and including Mr. Norman's trial, each of the co-Defendants in this case purportedly played similarly important roles. According to the Government - at least while Mr. Norman was on trial - Mr. Norman's co-Defendant, Waiel ("Wally") Yaghnam played a crucial role by way of his licensure as an insurance agent and his submission of numerous policies of insurance on the life of Andre Montgomery. In fact, during trial, each and every one of the Government's insurance company witnesses admitted that it was Yaghnam who made all of insurance application submission in the name of Andre Montgomery, *and* that there was no basis for any inference that Mr. Norman provide any of the information contained within any of those applications.

5

More specifically, at issue in this case were the life insurance applications submitted to United of Omaha, Royal Neighbors, Americo, and Foresters. Caitlyn Hogue testified concerning the United of Omaha insurance application file, which contained the United of Omaha's internal file notes. Ms. Hogue testified that the application file reflected: (i) Defendant Yaghnam and his business partner, Valarie Lewis completed the application; (ii) United of Omaha never contacted Mr. Norman regarding any answers provided on the application; (iii) it was unknown whether Defendant Yaghnam or Ms. Lewis ever met with Mr. Montgomery or Mr. Norman; (iv) it was unknown whether Mr. Montgomery's height and weight were correct at the time the application was completed; (v) Mr. Montgomery's address as listed on the application was never verified; the application was ultimately withdrawn by Defendant Yaghnam; (vi) it was unknown whether any other life insurance policies were pending or in effect for Mr. Montgomery; and (vii) United of Omaha did not rendered a disposition of the application. Significantly, Ms. Hogue testified that (i) the accuracy of Mr. Montgomery's height and weight was not material to the disposition of the application; (ii) she did not know if any pending applications would have been material to the disposition of the United of Omaha application; (iii) no premiums were ever paid on the policy; and (iv) United of Omaha never lost a penny as result of the application.

Patricia Adams testified concerning the Royal Neighbors application. Ms. Adams testified that she did not work for Royal Neighbors at the time the application was submitted; nor did she have anything to do with evaluating the application upon its submission. Moreover, Ms. Adams testified that: (i) Defendant Yaghnam submitted the application; (ii) it was unknown where Defendant Yaghnam got the information used to complete the application; and (iii) it was unknown who signed the application; it was unknown whether Mr. Norman knew Defendant Yaghnam submitted the application on Mr. Norman's behalf. Significantly, Ms. Adams testified that any

medical records Royal Neighbors required to evaluate the application would not have been requested from Mr. Norman, Mr. Montgomery, or Defendant Yaghnam. Rather, it was Royal Neighbor's practice to request medical records through a service. While Royal Neighbors requested Mr. Montgomery's medical records using a third-party service, the company never received a response to their request. Ms. Adams further testified that the application was closed as "incomplete," and no premiums were paid on the policy and Royal Neighbors never lost a penny as a result.

Next, Nancy Collins, chief underwriter for Americo, testified that (i) there was no factual basis to conclude that Mr. Norman was responsible for the handwritten portions of the application's answers; (ii) it was unknown who actually signed the application; (iii) Americo did not attempt to verify who signed the application; and (iv) it was unknown whether Andre provided the information provided on the application. Furthermore, Ms. Collins testified that when Americo contacted Mr. Norman with follow-up questions, Mr. Norman indicated that he was Timothy Norman, Andre Montgomery's uncle, and that Mr. Montgomery was unavailable at the time of the call because he was in school. Ms. Collins testified that when Mr. Montgomery returned the call to Americo, there no factual basis to believe that the individual purporting to be Mr. Montgomery was anyone other than Mr. Montgomery. Ms. Collins explained that the Americo policy never issued because it did not recognize a nephew-uncle relationship as a basis for an insurable interest.

Doug Parrott and David Sullivan testified regarding the Foresters application. Mr. Parrott testified that Foresters receives and processes many applications similar to the one it received for Mr. Montgomery. Mr. Parrott also testified that Foresters verified that there were no other pending or outstanding policies at the time it received the instant application. Mr. Parrott testified, however, that Foresters did not verify the address employment history information provided on the

application, and employment history was not required for a disposition of the application Mr. Parrott explained that the application did not explain what qualified an individual as a smoker. Mr. Sullivan testified that it was unknown whether Mr. Montgomery was healthy. The Foresters application ultimately issued; Foresters refunded every premium payment—all eighteen (18) premium payments— Mr. Norman paid towards the policy.

Despite all of that undisputed testimony from the Government's own witnesses that established the centrality of Yaghnam's role with respect to the mail and wire fraud Counts against Mr. Norman (and Yaghnam), this Court assessed a sentence top him of only 36 months. *See* Dkt. No. 447.

Furthermore, again according to the Government's position - at least through the time of Mr. Norman's trial - co-Defendant Terica Ellis ("Ellis") likewise played a material and crucial role in bringing about the death of Andre Montgomery. According to the Government's theory, Ellis allegedly accepted money up-front from Mr. Norman knowing that she would be tracking, interacting with, and leading Andre Montgomery to a spot to be killed. Yet, this Court imposed a sentence of just 36 months upon Ellis. *See* Dkt. No. 490. That essentially amounts to time served/release from custody for this purportedly highly important operative with regard to the murder of Andre Montgomery. Moreover, Ellis entirely avoided State and Federal charges arising out of her decade of interstate prostitution activities, her possible laundering of money in connection with the same, and her possible tax evasions with respect to those activities. Furthermore, Ms. Ellis also entirely avoided charges of making false statements to Government Agents, even though she admittedly lied to them in connection with her "cooperation" with them in this case, as well as obstruction/perjury charges arising out of her testimony at trial in this case. *See* Trial Transcript, Sept. 8, 2022, at pp. 91-95, 97. In other words, what amounts to a slap on the wrist sentence of

thirty-six months for Ellis – in comparison to a life sentence for Mr. Norman - cannot be justified based upon her "cooperation" in this case and plea of guilty. She was already handsomely rewarded for that cooperation by the decisions to not charge her at all for her various additional crimes.

In sum, a life sentence for Mr. Norman will clearly result in obvious disparities in sentences between Mr. Norman and each of his co-Defendants, particularly Hill and Ellis.

### *The Need For The Sentence To Reflect The Seriousness Of The Offense; Promote Respect for the Law; And To Provide Just Punishment*

One would be hard-pressed to find any member of the public who holds the belief that a sentence of even 20 years would not reflect the seriousness of the offense, promote respect for the law, and provide a just punishment to Mr. Norman. This is particularly true here, where in light of Mr. Norman's age, medical issues, and the likely expected conditions of his confinement within the BOP, could mean that even a 20-year sentence could effectively be a life-sentence. Moreover, in light of the sentences imposed upon the other co-Defendants in this case, the imposition of a sentence of life on Mr. Norman appears extremely draconian.

### *The Need For The Sentence To Provide Adequate Deterrence*

Mr. Norman has been more than adequately and *specifically* deterred from engaging in any criminal conduct. He has already been detained for some thirty months. Moreover, Mr. Norman has been detained during the COVID crisis, which, as has been uniformly recognized by federal courts across the country, has resulted in some of the most harsh and restrictive terms and conditions of confinement in BOP history. Even without the COVID crisis, Mr. Norman has been detained in a facility far from his family and friends, and one in which no outdoor time at all is provided to detainees. All of this has more than contributed to deterrence that has an impact directly upon Mr. Norman.

With respect to general deterrence, there is simply no empirical or other evidence to support the notion that whatever sentenced is imposed upon Mr. Norman that it will have any deterrence effect upon other potential offenders.

***The Need For The Sentence To Protect The Public From Further Crimes By The Defendant***

There is no basis to conclude that the public needs to be "protected" from Mr. Norman. In fact, the murder for hire crime that is at the center of this case was committed in 2016 – some seven (7) years ago. After that crime was committed, Mr. Norman was *no*t immediately arrested, and instead continued to lead a productive, gainfully employed, and consistently law-abiding life for four more years – until he was arrested and charged in this case in 2020. In any event, Mr. Norman himself is not alleged to have committed a crime of violence in connection with the offenses for which he was charged.

Furthermore, the other offenses for which Mr. Norman was charged and convicted in this case, i.e., mail and wire fraud, were committed some in the years *prior* to 2016, as many as nine (9) years ago. The Government has not claimed that Mr. Norman has continued to attempt to engage in those types of activities.

Finally, the United States Sentencing Commission's Preliminary Quarterly Data Report indicates that a person held in a general prison population has a life expectancy of approximately 64 years. *See, e.g., People v. Buffer,* 2017 IL App (1st) 142931; *see also, United States v. Nelson,* 491 F. 3d 344, 349-50 (7th Cir. 2007) (acknowledging the decreased life expectancy for incarcerated individuals based on United States Sentencing Commission data).

Therefore, pursuant to 3353, there is no continuing need to protect anyone, including the public at large, from Mr. Norman in terms of his potential commission of other crimes.

*Additional 3553 Factor: Recidivism*

Mr. Norman presents a low risk for recidivism. Mr. Norman is unlikely to engage in recidivist conduct in light of: his lack of any significant criminal history (prior to this case) from the time that he served a lengthy prison term beginning as a juvenile until his arrest in 2020 in this case; his age; his long history of gainful employment; his contributions to the community arising out of his financial success from his gainful employment; and his strong family ties. That lack of a risk for recidivism is supported empirically. *See, e.g.,* Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, RESEARCH SERIES ON THE RECIDIVISM OF FEDERAL GUIDELINE OFFENDERS, (May 2004). Furthermore, one of the greatest and most obvious challenges to any defendant, post-incarceration, is finding and keeping gainful employment. However, here, based upon Mr. Norman's substantial history of gainful employment, there is every reason to expect that he will not face as great an obstacle to finding gainful and meaningful work, and that he will continue to contribute to the community at large.

*Additional 3553 Factor: The Need To Provide Defendant With Needed Treatment*

As set forth in the PSR, Mr. Norman has certain medical conditions that require, and which will continue to require, medical care. Those conditions will only be exacerbated as Mr. Norman ages within the BOP. In turn, the system, or the public, will continue to unnecessarily bear those costs.

*Additional 3553 Factor: Cost Of Confinement*

It will be a waste of public resources to pay to incarcerate Mr. Norman for the duration of his lifetime. This is particularly true in the present case where: (1) the public does not need to be protected from Mr. Norman; (2) there is no basis or empirical evidence for concluding that such a duration of incarceration will provide any legitimate "rehabilitation" to Mr. Norman, much less any

greater rehabilitation because such services are not routinely offered within the BOP; (3) a period of incarceration for that duration will not provide any additional deterrence specifically to Mr. Norman; and (4) such a period of incarceration will not generally deter anyone else by sending some "type" of message to the public.

**WHEREFORE**, Defendant, JAMES TIMOTHY NORMAN, by and through his undersigned attorneys, respectfully submits that this Court should consider the section 3553 factors in assessing Mr. Norman's sentence in this matter.

**Respectfully Submitted,**

By: /s/Michael Leonard,
Michael I. Leonard
Leonard Trial Lawyers
120 N. LaSalle Street, 20th Floor
Chicago, Illinois 60602
312-380-6559 (office)
312-264-0671 (fax)
mleonard@leonardtriallawyers.com
(Illinois Bar. No. 6207335)


/s/Gloria V. Rodriguez,
Gloria V. Rodriguez
9 North County Street, Suite 102
Waukegan, IL 60085
Ph: (847) 672-8888
Fax:(312) 277-3384
gloria@gloriaslaw.com
(Illinois Bar No. 6306930)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

      I, Gloria Rodriguez, one of the attorneys for Defendant, hereby certify that I caused to be served a true and accurate copy of the foregoing document on all parties of record by way of this Court's ECF filing system on February 22, 2023.


      By:    */s/Gloria Rodriguez*
                  **Gloria Rodriguez**